# Commonwealth v. Starkey

C.P. of Chester County, no. 99-07328.

*Michelle Fioravanti,* for Commonwealth.
*S. Lee Ruslander II,* for defendant.

MELODY JR., *J.,* June 9, 2000—We have before us, defendant's "petition to appeal license suspension" which was filed on August 25, 1999. Said petition sets forth the following grounds for us to sustain his appeal as follows:

(2) That there was no reasonable basis to conclude that the petitioner refused to submit to chemical testing.

(3) That the petitioner did all that was requested of him in regards to the chemical testing.

(4) That the breath testing equipment malfunctioned and should have been removed from service.

(5) That the police should have, but did not, request the petitioner to submit to a blood test after the breath testing machine malfunctioned.

(6) That, alternatively, the petitioner provided two breath samples during the course of the chemical testing and thus complied with any statutory requirements imposed upon him.

On October 21, 1999, the defendant filed a "petition to amend and clarify license suspension appeal." On the same date, Judge J.P. MacElree II handed down an order granting the amendment of the original petition to include the following:

(7) That the police failed to inform petitioner why he was being requested to submit to a second chemical test of his breath.

(8) That the police failed to inform petitioner why he had to submit to a third chemical test of his breath.

(9) That the police failed to wait the required 20 minutes within which to observe the petitioner prior to conducting the second and third chemical tests.

In addition, said petition to amend sets forth the following:

(3) That the original application touched on these amendments but did not set forth the challenges with the degree of specificity desired by counsel.

(4) That on September 22, 1999, after the original appeal was filed, the Commonwealth Court handed down its decision in *Karabinos v. PennDOT,* 739 A.2d 601 (Pa. Commw. 1999).

(5) That *Karabinos* is exactly on point and is dispositive of this appeal.

Further, during the initial hearing in this matter on January 20, 2000, Mr. Ruslander, the defendant's attorney, stated "there are two things that I wanted to add to my petition." After some discussion, Mr. Ruslander's request was not objected to by the attorney for the Commonwealth. Mr. Ruslander then handed up to the court, amendments to his amended petition (N.T. pp. 26, 27, 28, 29 and 30) as follows:

(2) That petitioner seeks to add the following to his appeal:

(10) That the police failed to observe the defendant for 20 minutes prior to administering the first breath test.

(11) That the police failed to advise the petitioner of the required implied consent warnings prior to the second and third series of chemical testing.

(12) That the amendments are based on the testimony presented at the hearing.

After hearings on January 20, 2000 and March 30, 2000 and arguments of counsel, we determine as follows:

## FINDINGS OF FACT[1]

### Trooper Christopher Hessler

(1) On July 19, 1999, at approximately 9:12 in the evening, Trooper Hessler, with reasonable suspicion, stopped the defendant's vehicle. (N.T. pp. 5, 6 and 9, 1/20/00.)

(2) At 9:20 p.m., the defendant was transported to the Avondale State Police Barracks by Trooper Hessler. (N.T. p. 11, 1/20/00.)

(3) "I generally read the warnings, then wait the 20 minutes." "I should say that is how I always do it." (N.T. pp. 14 and 15, 1/20/00.)

(4) According to the 119 affidavit, part of the criminal complaint, and the testimony of Trooper Hessler, he read the implied consent form to the defendant at 2135 hours (9:35 p.m.). (N.T. p. 15, 1/20/00.)

---

1. Our findings of fact are, at this time, limited to those necessary to support our decision in this matter and the issues involved.

(5) At the barracks, Corporal Mason took the defendant to administer the breath test. (N.T. pp. 14 and 19, 1/20/00.)

(6) Trooper Hessler did not keep the defendant under observation for at least 20 consecutive minutes. (1/20/00.)

### Corporal John Mason

(7) Corporal Mason's purpose to place a defendant under observation prior to criminal testing was to observe him to make sure that he did not consume any alcohol, to keep him physically under observation. (N.T. pp. 21 and 22, 1/20/00.)

(8) Corporal Mason did not keep the defendant under observation for at least 20 consecutive minutes. Corporal Mason did not *personally* watch the defendant the whole time to make sure that he did not put anything in his mouth, like a lifesaver or a cough drop. (N.T. p. 22, 1/20/00.)

(9) Corporal Mason was present when Trooper Hessler read to the defendant the implied consent warnings. Corporal Mason then took the defendant back into the area where the Intoxilyzer 5000 was located. He then explained to the defendant how he wanted the test done. He then demonstrated, for the defendant, how he wanted him to blow into the mouthpiece and took the information from the defendant's driver's license, put it into the system and prepared the test. (N.T. pp. 22 and 23, 1/20/00.)

(10) The defendant consented to chemical testing (breathalyzer). The defendant blew into the breathalyzer a total of six times. (Exhibit C-2, exhibit C-3, exhibit C-4.)

(11) Exhibit C-2 shows the first breath sample to be .175 and the second breath sample to show an *invalid sample* (mouth alcohol present difference between two breath samples is .020 percent BAC or greater).

(12) Exhibit C-3 shows that the first breath sample was .185 and the second breath sample to show an *invalid sample* (mouth alcohol present difference between two breath samples is .020 percent BAC or greater).

(13) Exhibit C-4 shows that the first breath sample was .176 and the second breath sample to show insufficient sample.

(14) Exhibit C-5 is page 34 from Corporal Mason's "The Intoxilyzer 5000 operations guide for the Pennsylvania State Police" dealing with the definition of "invalid sample."

(15) Exhibit C-6, in the same manual, on page 35, deals with the definition of "insufficient sample."

(16) There is a difference between "insufficient sample" and "invalid sample." (Exhibit C-5, exhibit C-6 and N.T. pp. 51 and 52.)

(17) The first test began when the defendant blew for the first time at 2154 hours (9:54 p.m.) and the test was completed at 2158 hours (9:58 p.m.). (Exhibit C-2 and N.T. p. 56.)

(18) The second test began at 2202 hours (10:02 p.m.) and ended at 2208 hours (10:08 p.m.). (Exhibit C-3.)

(19) The third test began at 2212 hours (10:12 p.m.) and ended at 2219 hours (10:19 p.m.). (Exhibit C-4.)

(20) There was no attempt, by the troopers, between the first and second tests to observe the defendant for 20 minutes prior to administering the test. (Exhibit C-2, exhibit C-3 and N.T. p. 60.)

(21) There was no attempt, by the troopers, between the second and third tests, to observe the defendant for 20 minutes prior to administering the test. (Exhibit C-3, exhibit C-4 and N.T. p. 62.)

(22) "The Intoxilyzer 5000 operations guide for the Pennsylvania State Police" (Corporal Mason's manual) provides that when the printout indicates an amount of alcohol in the mouth, that the operator should wait 20 minutes before starting another test. In this case, Corporal Mason did not follow the procedures set forth in the "guide" or "manual." (N.T. pp. 66 and 67.)

(23) Between the first and the second test, Corporal Mason did not follow the 20-minute observation, nor wait as suggested in his "manual" or "guide." (N.T. p. 60.)

(24) Between the second and third test, Corporal Mason did not follow the 20-minute wait as suggested in his "manual" or "guide." (N.T. p. 67.)

(25) Corporal Mason did not explain, to the defendant, what "invalid sample" meant. (N. T. p. 67.)

(26) The Southern Chester County Medical Center is approved to draw blood for alcohol determination. (N.T. p. 68.)

(27) The Avondale barracks is about 5 miles from the Southern Chester County Medical Center. (N.T. p. 68.)

### Corporal Douglas O'Connor

(28) Corporal O'Connor's duties, inter alia, consist of intoxilizer maintenance and Intoxilyzer 5000 class A operator, and for both, has been certified by the Pennsylvania State Police to do so. (Exhibit C-9 and C-10, 3/30/00.)

(29) The reason for a 20-minute observation period, prior to the initial administration applies, among other things, to a person who has mouth alcohol present, so that the mouth alcohol will have time to dissipate before the next test. (N.T. p. 28, 3/30/00.)

(30) When a reading comes out from the machine, that indicates that mouth alcohol is present. A 20-minute observation period should then ensue before further testing is conducted. (N.T. p. 29, 3/30/00.)

### Trooper Christopher Hessler (Recalled)

(31) Trooper Hessler stopped the defendant at 9:12 p.m. He placed him into custody at approximately 9:27 p.m. Trooper Hessler put the defendant in his patrol vehicle and transported him back to the Avondale barracks where they arrived at 9:30 p.m. (N.T. pp. 32 and 33, 3/30/00.)

(32) Trooper Hessler did not observe the defendant place anything in his mouth after he was taken into custody at 9:27 p.m.

(33) It was not possible for Trooper Hessler to safely drive his patrol vehicle and at the same time, continuously observe the defendant in the back seat of the vehicle through the rearview mirror. Thus, we find that Trooper Hessler did not continuously observe the defendant from 9:27 p.m. until 9:30 p.m., pursuant to the Pa. Code, title 67 §77.24. Breath test procedures.

(34) The defendant was never observed for at least 20 consecutive minutes immediately prior to the administration of the first alcohol breath test pursuant to the requirements of the Pennsylvania Code, title 67 §77.24. Breath test procedures (a) observation.

(35) All of the time preceding the reading of the implied consent warnings must be eliminated from the 20-minute observation time, such as:

"(A) The time when the defendant was in the patrol vehicle.

"(B) The time walking into the police barracks."

(36) Some of the time after reading of the implied consent warnings must be eliminated from the 20-minute observation time such as:

"(A) The time when Corporal Mason was preparing the Intoxilyzer.

"(B) The time when Corporal Mason typed into the Intoxilyzer all of the information at the middle of exhibit C-2 concerning the defendant's name, date of birth, driver license number, arresting officer and the incident number."

(37) The state police did not conduct its observation of the defendant in the obvious and reasonable manner contemplated by Pa. Code title 67 §77.24(a).

(38) The state police did not conduct its testing and observance of the defendant in the obvious and reasonable manner contemplated by "The Intoxilyzer 5000 operations guide for the Pennsylvania State Police."

## DISCUSSION

The Pennsylvania Code title 67 §77.24 breath test procedures subsection (a) *observation* provides as follows:

"The person to be tested with breath test equipment shall be kept under observation by a police officer or certified breath test operator for *at least* 20 consecutive minutes immediately prior to administration of the first alcohol breath test given to the other fluids, regurgitated, vomited, eaten or smoked. Custody of the person may be transferred to another officer or certified breath test operator during the 20 consecutive minutes or longer period as long as the person to be tested is under observation for at least 20 consecutive minutes prior to initial administration of the alcohol breath test." (emphasis added)

Further, "The Intoxilyzer 5000 operations guide for the Pennsylvania State Police" provides as follows:

"The instrument detected residual *mouth alcohol* in the subject's breath sample. The instrument completes the mode sequence, prints 'Invalid Sample .xxx' in place of 'Subject Test .###,' and prepares itself to begin another test.

"Since the normal body processes eliminate residual *mouth alcohol* within 20 minutes, observe the subject for at least 20 minutes before beginning another breath analysis. During the observation time, the subject may not smoke, eat, drink or introduce any substance into his mouth. Furthermore, if the subject regurgitates, note the time and delay beginning a breath analysis for at least 20 minutes. (Exhibit C-5 p. 4 of "guide" or "manual.") (emphasis added)

Initially, we note the word *regurgitate*, in the code, and more specifically the "guide" or "manual" sets forth what is to be done by the operator of the machine if the defendant regurgitates.

There is certainly a difference between "regurgitate" and vomit. Said difference is obvious from a reading of their definitions and also from a reading of exhibit C-1, page (34) of the Intoxilyzer 5000 "manual" or "guide." The exhibit sets forth: "Furthermore, if the subject *regurgitates,* note the time and delay beginning a breath analysis for *at least* 20 minutes."

*Regurgitate* is defined as follows:

"(A) Reader's Digest, Oxford, Complete WordFinder, 1996 American edition: '(1) bring (swallowed food) up again *to* the mouth.' (emphasis added) While *vomit* is defined '(1) eject (matter) from the stomach *through* the mouth.' (emphasis added)

"(B) Funk & Wagnalls New College Standard Dictionary, June, 1947 edition: (2) 'To cause to *surg back;* as ruminants regurgitate food already swallowed.' (emphasis added) While vomit is defined '(1) To *throw up* from the stomach; spew; belch forth.' (emphasis added) '(2)

To *eject* forcibly or issue with violence from any hollow place; be *ejected.*' " (emphasis added)

Thus, in the case sub judice, we have a situation where either the defendant regurgitated or the breathalyzer equipment should have been removed from service under section 77.25(b)(4) because of the various readings on the printouts.

In addition, we have noted that although the troopers believe that the defendant was observed *continuously* for at least 20 minutes, that is not possible from the evidence presented by the Commonwealth.

First, because the defendant was advised of his implied consent warnings at 9:35 p.m. and he first blew into the equipment at 9:54 p.m., such time is obviously only 19 minutes.

Second, we have eliminated certain time when Corporal Mason was doing paperwork and entering information into the intoxilyzer.

Third, we have found that the troopers did not comply with Pa. Code 77.24. Breath test procedures. Subsection (a) observation.

Fourth, the troopers failed to comply with "The Intoxilyzer 5000 operations guide for the Pennsylvania State Police" with regard to the procedure after an "invalid sample."

## CONCLUSIONS OF LAW

(39) The Commonwealth has failed to meet its burden of proof.

(40) The troopers failed to comply with Pennsylvania Code title 67 §77.24. Breath test procedures. (a) Observation.

(41) The troopers failed to comply with "The Intoxilyzer 5000 operations guide for the Pennsylvania State Police."

(42) Thus, the defendant did not refuse to submit to chemical testing. First, because he agreed to submit to chemical testing, and second, because the state police did not comply with the requirements to establish the administration of proper, lawful and fair tests.

We note that this decision only decides the issues of the 20-minute observation of this defendant, and the 20-minute wait and observation of the defendant with regard to "invalid sample."

Because our decision disposes of the suspension by the Commonwealth, it is not necessary for us to determine the defendant's other issues. We leave the other issues for another day and another court.

## ORDER

And now, June 9, 2000, upon consideration of the evidence, it is hereby ordered and decreed that the appeal of operating privilege suspension is sustained and the suspension is rescinded.[1]

---

1. We note that this decision only decides the issues of the 20-minute observation of this defendant and the 20-minute wait and observation of the defendant with regard to "invalid sample."

Because our decision disposes of the suspension by the Commonwealth, it is not necessary for us to determine the defendant's other issues. We leave the other issues for another day and another court.